232 U.S. 478 (1914)
PERRIN
v.
UNITED STATES.
No. 707.
Supreme Court of United States.
Submitted January 13, 1914.
Decided February 24, 1914.
ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF SOUTH DAKOTA.
*479 Mr. Charles H. Bartelt and Mr. Edwin R. Winans for plaintiff in error.
Mr. Assistant Attorney General Wallace for the United States.
*480 MR. JUSTICE VAN DEVANTER delivered the opinion of the court.
This direct writ of error brings under review a judgment of conviction for unlawfully selling intoxicating liquors upon ceded lands formerly included in the Yankton Sioux Indian Reservation, in the State of South Dakota. This reservation was created by the treaty of April 19, 1858, 11 Stat. 743, for the use of the Yankton tribe of Sioux Indians, and originally embraced 400,000 acres. A considerable part of it was allotted in severalty to the members of the tribe under the act of February 8, 1887, c. 119, 24 Stat. 388, and the amendatory act of February 28, 1891, c. 383, 26 Stat. 794, the allotments being in small tracts scattered throughout the reservation. By an agreement ratified and confirmed by Congress August 15, 1894, 28 Stat. 286, 314, c. 290, the tribe ceded and relinquished to the United States all the unallotted lands. In article 17 of the agreement it was stipulated: "No intoxicating liquors nor other intoxicants shall ever be sold or given away upon any of the lands by this agreement ceded and sold to the United States, nor upon any other lands within or comprising the reservations of the Yankton Sioux or Dakota Indians as described in the treaty between the said Indians and the United States, dated April 19th, 1858, and as afterwards surveyed and set off to the said Indians. The penalty for the violation of this provision shall be such as Congress may prescribe in the act ratifying this agreement." And in the ratifying act it was provided, 28 Stat. 319: "That every person who shall sell or give away any intoxicating liquors or other intoxicants upon any of the lands by said agreement ceded, or upon any of the lands included in the Yankton Sioux Indian Reservation as created by the treaty of April nineteenth, eighteen hundred and fifty-eight, shall be punishable by imprisonment for not more than two *481 years and by a fine of not more than three hundred dollars."
Conformably to § 5 of the act of 1887, each allottee was given a trust certificate declaring that the United States would hold the land embraced in his allotment, for the period of twenty-five years or such extended period as the President might direct, in trust for him, or, in case of his decease, for his heirs, but without power in him or them to convey or make any contract touching the land during the trust period, and at the expiration of that period would issue to him or them a patent conveying the title in fee, discharged of the trust. Some of the allotted lands were subsequently disposed of pursuant to express authority from Congress, and those remaining approach 100,000 acres, occupied by more than 1,500 Indians. Rep. Com. Ind. Affairs, 1911, p. 72. The trust period has not expired, nor has the tribal relation of the Indians been dissolved. An agent or superintendent remains in charge of their affairs and they are still wards of the Government. Hallowell v. United States, 221 U.S. 317; United States v. Sandoval, 231 U.S. 28.
The ceded lands, excepting some small tracts retained by the Government as sites for an Indian agency, Indian schools, and the like, were opened to disposition under the homestead and townsite laws, May 21, 1895, 29 Stat. 865, and have largely passed into private ownership.
The place at which the intoxicating liquors were sold was within the defendant's own premises in the town of Dante, an organized municipality located upon a part of the ceded lands then held in private ownership by the inhabitants, none of whom was an Indian. The defendant is a white man, but whether the persons to whom the liquors were sold were white or Indian does not appear, and is immaterial under the statutory provision before quoted, upon which the prosecution was founded.
The objections urged in the District Court against the *482 conviction, and now renewed, call in question the validity of that statutory provision and are, first, that the power to regulate the sale of intoxicating liquors upon all ceded lands rests exclusively in the State, and, second, that if Congress possesses any such power it necessarily is limited to what is reasonably essential to the protection of the Indians occupying the unceded lands, and that this limitation is transcended by the provision in question because it embraces territory greatly in excess of what the situation reasonably requires and because its operation is not confined to a designated period, reasonable in duration, but apparently is intended to be perpetual.
The power of Congress to prohibit the introduction of intoxicating liquors into an Indian reservation, wheresoever situate, and to prohibit traffic in such liquors with tribal Indians, whether upon or off a reservation and whether within or without the limits of a State, does not admit of any doubt. It arises in part from the clause in the Constitution investing Congress with authority "to regulate commerce with foreign nations, and among the several States, and with the Indian tribes," and in part from the recognized relation of tribal Indians to the Federal Government. United States v. Holliday, 3 Wall. 407, 417; United States v. Sutton, 215 U.S. 291; Hallowell v. United States, supra; Ex parte Webb, 225 U.S. 663, 683, 691; United States v. Wright, 229 U.S. 226; United States v. Sandoval, supra. "These Indian tribes are the wards of the Nation. They are communities dependent on the United States. . . . From their very weakness and helplessness, so largely due to the course of dealing of the Federal Government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the Executive and by Congress, and by this court, whenever the question has arisen." United States v. Kagama, 118 U.S. 375, 383.
*483 Whether this power to protect the Government's Indian wards against the evils of intemperance, of which they are easy victims, is sufficiently comprehensive to enable Congress, when securing the cession of part of an Indian reservation within a State, to prohibit the sale of intoxicants upon the ceded lands, if in its judgment that is reasonably essential to the protection of the Indians residing upon the unceded lands, is the real question presented by the first of the defendant's objections. We say it is the real question, because if Congress possesses power to do this it follows that the State possesses no exclusive control over the subject and that the congressional prohibition is supreme. United States v. Holliday, supra, p. 419.
The stipulation before quoted shows that when the Indians and the commissioners representing the United States agreed upon a cession of the unallotted lands, among which the allotted tracts were interspersed, both were of opinion that due regard for the welfare of the Indians required that traffic in intoxicants upon the ceded lands be interdicted, as it was before the cession; and Congress, evidently being of a like opinion, inserted in the ratifying act the provision making it a punishable offense for any person to sell or give away any intoxicating liquors or other intoxicants upon any of the ceded lands. Stipulations and provisions of this character are not new, but have occasionally appeared in Indian treaties and legislation for more than fifty years. The case of United States v. Forty-three Gallons of Whiskey, 93 U.S. 188, arose out of a treaty with the Chippewas in 1863, 13 Stat. 668, wherein a considerable portion of a reservation in the State of Minnesota was ceded to the United States. The treaty contained a stipulation that the laws of the United States, then in force or thereafter enacted, prohibiting the introduction and sale of spirituous liquors in the Indian country should be operative throughout the ceded lands *484 until Congress or the President should direct otherwise, and the principal question in the case was whether this stipulation encroached upon the power of the State and upon its equal footing with the original States. This court upheld the stipulation, and in the course of the opinion, after observing (p. 194) that the power of Congress to regulate commerce with the Indian tribes is "as broad and as free from restrictions as that to regulate commerce with foreign nations," said (p. 195): "As long as these Indians remain a distinct people, with an existing tribal organization, recognized by the political department of the Government, Congress has the power to say with whom, and on what terms, they shall deal, and what articles shall be contraband. If liquor is injurious to them inside of a reservation, it is equally so outside of it; and why cannot Congress forbid its introduction into a place near by, which they would be likely to frequent? It is easy to see that the love of liquor would tempt them to stray beyond their borders to obtain it; and that bad white men, knowing this, would carry on the traffic in adjoining localities, rather than venture upon forbidden ground." And again (p. 197): "The chiefs doubtless saw, from the curtailment of their reservation, and the consequent restriction of the limits of the `Indian country,' that the ceded lands would be used to store liquors for sale to the young men of the tribe; and they well knew, that, if there was no cession, they were already sufficiently protected by the extent of their reservation. Under such circumstances, it was natural that they should be unwilling to sell, until assured that the commercial regulation respecting the introduction of spirituous liquors should remain in force in the ceded country, until otherwise directed by Congress or the President. This stipulation was not only reasonable in itself, but was justly due from a strong government to a weak people it had engaged to protect. . . . Based as it is exclusively on the Federal *485 authority over the subject-matter, there is no disturbance of the principle of state equality." The case came here a second time and the views before expressed were reaffirmed. 108 U.S. 491.
The case of Dick v. United States, 208 U.S. 340, is even more in point. There the Nez Perce tribe, by an agreement ratified by Congress, had ceded to the United States a large portion of their reservation in the State of Idaho, and in the agreement was a stipulation subjecting the ceded lands, for a period of twenty-five years, to the Federal laws prohibiting the introduction of intoxicants into the Indian country. The major part of the unceded lands was allotted in severalty to members of the tribe under the acts of 1887 and 1891, supra, and the ceded lands were opened to disposition under the public-land laws. In regular course, some of the ceded lands were patented to white men and came to be the site of a town. Under the stipulation, Dick was prosecuted for introducing intoxicating liquors into the town and was convicted; whereupon he brought the judgment here for review, his chief contention being that, in view of Idaho's position as a State, Congress was without constitutional power to authorize or ratify the stipulation. Upon full consideration this court affirmed the judgment, and, following United States v. Forty-three Gallons of Whiskey, supra, and other cases, held that the stipulation was a valid regulation and not subject to objection on constitutional grounds. See also Bates v. Clark, 95 U.S. 204, 208; Clairmont v. United States, 225 U.S. 551, 558.
We could not sustain the defendant's first objection without departing from the principles announced and applied in those cases, and this we have no disposition to do, for we regard them as embodying a right conception of the power of Congress in dealing with the Indian wards and adopting measures for their protection.
We come, then, to the objection that the prohibition in *486 the act of 1894 covers an unnecessarily extensive territory and is not limited in duration, and so transcends the power of Congress.
As the power is incident only to the presence of the Indians and their status as wards of the Government, it must be conceded that it does not go beyond what is reasonably essential to their protection, and that, to be effective, its exercise must not be purely arbitrary, but founded upon some reasonable basis. Thus, a prohibition like that now before us, if covering an entire State when there were only a few Indian wards in a single county, undoubtedly would be condemned as arbitrary. And a prohibition valid in the beginning doubtless would become inoperative when in regular course the Indians affected were completely emancipated from Federal guardianship and control. A different view in either case would involve an unjustifiable encroachment upon a power obviously residing in the State. On the other hand, it must also be conceded that, in determining what is reasonably essential to the protection of the Indians, Congress is invested with a wide discretion, and its action, unless purely arbitrary, must be accepted and given full effect by the courts.
The claim that the territory covered by this prohibition is so excessive as to make it purely arbitrary is devoid of merit. The original reservation embraced 400,000 acres, a district practically 25 miles square. The allotments are in small tracts scattered throughout this district and aggregate nearly 100,000 acres. The number of Indians affected is upwards of 1,500 and they are more or less in a state of transition from an unsettled to a settled life. In this situation, and having some regard to the weakness of Indians in respect of the use of intoxicants, we are far from believing that Congress exceeded the limits of its discretion in applying the prohibition to all the ceded lands.
*487 Of the claim that the prohibition is not expressly limited in its duration it is enough to observe that this objection cannot be of present avail. The conditions justifying the prohibition remain substantially the same as when it was adopted. The trust period has not expired, the tribal relation has not been dissolved, and the wardship of the Indians has not been terminated. See Tiger v. Western Investment Co., 221 U.S. 286, 315; Act May 8, 1906, 34 Stat. 182, c. 2348; United States v. Pelican (decided this day, ante, p. 442). The fact that the conditions may become so changed in the future as to render the prohibition inoperative affords no reason for condemning it now. Unless sooner repealed, it will continue in force as long as the presence and status of the Indians sustain it as a Federal regulation.
Judgment affirmed.